## BENNETT v. HUNGATE.

(District Court, S. D. New York. December 30, 1922.)

1. Brokers ⚖➲23—One using moneys received for investment in purchases on margin must stand loss.

If funds received by defendant from plaintiff were to be invested by defendant within the usual meaning of that word, losses sustained in buying on margin were chargeable against defendant, and he must account for the funds received.

2. Brokers ⚖➲37—Evidence held to show funds were delivered for investment and not to use in marginal dealings.

Evidence in suit for accounting *held* to show that moneys turned over to defendant by plaintiff were to be invested, and that defendant had no authority to use them in buying on margin.

⚖➲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Brokers ⚖═37, 65(1)—Agent misapplying fund charged compound interest and denied compensation.**

Where defendant, intrusted by plaintiff with money for investment, in violation of instructions, used it in marginal dealings in which it was lost, he will be charged with compound interest at annual rests and denied compensation for his services.

In Equity. Suit by William T. Bennett against Wilson Hungate. Decree for plaintiff.

C. B. Garver, of New York City, for plaintiff.

William A. Ulman, of New York City, for defendant.

LEARNED HAND, District Judge. [1, 2] The crux of this case is whether the parties contemplated that Hungate should "invest" Bennett's funds in the usual sense of that word, or whether he might buy on margin. If the losses arose from a course of dealing forbidden by the contract, they are chargeable against the trustee and he must account for the res. Hence it becomes necessary to analyze the evidence with that point in mind. Bennett says in his answer to the sixth interrogatory that the money was paid that Hungate "might invest the sum in sound securities"; in the answer to the eighth, that it was given "to invest for me in sound securities"; and, in the answer to the ninth interrogatory, he repeats the same thing in substantially the same words. In this, it is true, there is no express disclaimer that the fund might be used for speculation, yet that is the·clear implication, because speculation is not "sound and profitable investment."

Hungate says that it was Bennett's expressed intention that he should "buy on margin," and if that is true, he did no more than he was told to do; although the conduct of the account even on that theory might be scrutinized. It is however possible, I believe, to pick out from the contemporaneous documentary evidence and conduct of the parties enough corroboration of Bennett's version to sustain his burden of proof. Thus at the end of two years and on July 21, 1919, answering a letter from Bennett about his investment, Hungate wrote:

"This now shows a nice profit and has also earned excellent dividends from the beginning and will undoubtedly continue to do so as the income is guaranteed by the British government. In view of the definite information I have, it would be inadvisable to sell at this time. In a few days I will send you a statement showing exactly how you stand."

Such a letter appears to me entirely inconsistent with the idea that Hungate had a general and roving commission to speculate with Bennett's money. It would naturally be read as meaning that Hungate had bought a guaranteed stock which had appreciated and declared regular dividends. Of course, it might not have been paid for in full; but no one can suppose that the money had been used as margin for the usual gambling account. There is no possible conclusion but that Hungate, who had been actively speculating throughout the period, knew that it was contrary to the agreement and was willing to let Bennett believe that he had bought and was holding a single security. Bennett appears to have been content with this assurance until

Hungate arrived in England early in 1920. The two then met, and while Bennett did not mention his affairs at once (which is indeed surprising), on February 24th he wrote asking for particulars. Hungate had accepted an invitation to visit him at his home, and he answered on March 7th, saying that he would tell him on that visit about his investment. He never did make the visit, and in view of his later conduct and his wire of March 31st it is not unfair to assume that he failed to do so in order to avoid unpleasant disclosures or some further fabrication.

However, the parties did meet in London about the middle of March and had a talk about the investment. Bennett says that Hungate told him that his money was then in ten Chile bonds, bought at $110, whose value with increase was $14,000. In corroboration he produces a memorandum made at the time, as Hungate concedes, which shows the purchase of ten 8 per cent. Chile bonds at $110, amounting to $11,000. The memorandum contains other figures, among which is $14,000, reached in a way which is not explained, but the purchase of the ten bonds at $110 seems proved. It is pretty certain that Hungate had told him that his money at that time was represented by these securities, a false statement, though the account did include them. It is also very reasonable to assume that he represented these as paid for, and not bought upon margin. Consider the situation at the time. The money, $9,535, had been nearly three years in Hungate's hands, and 8 per cent. was the profit at least at that time. The earlier investment, a stock, may well have earned as much. Eight per cent. for that period would make the sum over $11,000 without the profit of which he had assured Bennett in July, 1919. It could not have been necessary to hold the securities on margin if their amount was no larger; it was well within possibilities that it should have appreciated another 20 per cent. during the same time. This interview in my judgment supports the conclusion that Hungate's commission was only to "invest" in the usual sense.

Bennett's letter of April 21, 1920, is further corroboration, equally probative whether or not it ever reached Hungate, unless indeed it is a later fabrication. Hungate had not paid the visit, wiring instead from Paris, on March 31st, that he was ill. Bennett, learning that he was about to go back to America, was becoming uneasy; he had not got the detailed statement which he expected. In the letter of April 21st he said that he wished the transaction closed out and mentioned that Hungate had said that the fund had reached $14,000. He would scarcely have written so, if it was untrue.

Hungate got home about the end of April and then, as he says, for the first time learned that his brokers had closed out his account. His version of how he expected his brokers to carry it in his absence is not very convincing and is uncorroborated, though so far as appears Neuberger was available. Just why a broker should have assured him that his account would be carried, though the margin was entirely lost, it is hard to see. At least, he enjoyed a partiality which is not commonly extended. But if so, why should he not at once have advised Bennett? On his theory he had nothing with which to reproach himself;

certainly not if he had been frank with Bennett while in London. True, it might have been better to close out the account when he left New York, but Neuberger's assurance he might rightly have accepted; Bennett could not reasonably have complained of that.

Instead of this, although Bennett urgently wired him on May 31st, June 24th, and August 19th, and wrote him on July 2d and September 3d, he made no answer whatever except to wire on July 21st that he would reply that week, which he did not do. This is not the conduct of a man who has done no more than follow his friend's injunctions, even after they have turned out disastrously. The excuse will not serve. It was natural that when he learned that the market had in his absence gone against the account, he should have been disturbed; but if he had been fair with his beneficiary, he would have at once set himself right. That was not hard to do; his commission was only a license to gamble with Bennett's money, and it had failed. That was a misadventure one must expect, when one treads that path. But never to answer, not to have the courage to give a single word of explanation, to sit mute until suit was brought, how can that accord with the conduct of a man who has only to break bad news to a friend? If his case was a good one, at least he managed to give it the worst possible face.

[3] I conclude therefore that the agreement was, as Bennett says, to invest the money in the usual sense of the term, and that when Hungate used it as margin in a general speculative account he violated his trust and must account. I shall apply the usual rule in the case of trustees who have willfully violated their instructions, and charge the account with compound interest, annual rests, beginning June 1, 1917. Barney v. Saunders, 16 How. 535, 542, 543, 14 L. Ed. 1047; Cook v. Lowry, 95 N. Y. 103, 113, 114. The solicitors can no doubt calculate and agree upon the proper sum to be entered in the decree, which will of course carry costs. Hungate will not be allowed any compensation for his services, these not being rendered in the execution of his trust. Hansen v. Barnard (C. C. A. 2) 270 Fed. 163. Moreover, it becomes unnecessary to determine whether under the agreement Hungate was entitled to one-fourth the profits, if there had been any. That was to be his compensation, if so agreed, for services which in fact he never rendered.

It is possible that Bennett meant to use the note, which he took, in fraud of his income tax statement; but the proof is not clear. The case is not one in which conduct has been shown which should defeat his suit in a court of equity. In any event, if he is to forfeit his money on any such ground, not only must the proof be clear, but the supposed wrongdoing must enter into the transactions of the parties.

Settle decree on notice.